UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **DAVID JONES, KEITH WILCOX and KEELY VONDELL,**<br>**Individually and on behalf of Oneida Nations Enterprises LLC 401(k) Plan and on behalf of all the similarly situated Participants and beneficiaries of the plan,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**TURNING STONE ENTERPRISES LLC, f/k/a ONEIDA NATIONS ENTERPRISES, LLC; and EMPLOYEE BENEFITS PLAN & INVESTMENT COMMITTEE OF THE ONEIDA NATION ENTERPRISES, LLC 401(K) PLAN;**<br>**John and Jane Does 1-30 in their capacities as members of the Administrative Committee,**<br><br>**Defendants** | **Case Action No.** 5:24-cv-1596 (GTS/ML)<br>**_____**<br><br>**JURY TRIAL DEMANDED** |

<u>**CLASS ACTION COMPLAINT**</u>

**I.  NATURE OF THE ACTION**

1.      Plaintiffs David Jones, Keith Wilcox, and Keely Vondell (collectively "Plaintiffs")

individually,   as representatives of the class, and on behalf of Turning Stone Enterprises LLC

(formerly Oneida Nations Enterprises LLC) 401(k) plan ("the Plan") bring this action under 29

U.S.C. §§ 1132(a) (2) and (3) & 409(a) against Defendants (1) Turning Stone Enterprises LLC

("Turning Stone"), (2) the Employee Benefits Plan & Investment Committee of the Oneida Nation

Enterprises, LLC 401(K) Plan ("Committee"), (3) Ray Halbritter, Dana Sovocool, Kyle Ortlieb

and Peter Carmen and (4) John Does 1-30 in their capacities as members of the Committee

(collectively, "Defendants"), to remedy Defendants' breaches of fiduciary duties and other violations of the Employee Retirement Income & Security Act (ERISA), U.S.C. 29 1001, et seq.

2.      Defined contribution plans that are qualified as tax-deferred vehicles under Section 401 of the Internal Revenue Code, 26 U.S.C. §§ 401(a) and (k) (i.e., 401(k) plans), have become the primary form of retirement savings in the United States and, as a result, America's *de facto* retirement system. Unlike traditional defined benefit retirement plans, in which the employer typically promises a calculable benefit and assumes the risk with respect to high fees or under-performance of pension plan assets used to fund defined benefits, 401(k) plans operate in a manner by which participants bear the risk of high fees and investment underperformance.

3.      As fiduciaries to the Plan, Defendants were obligated at all times to act prudently and for the exclusive benefit of participants and beneficiaries. These Defendants did not because they consistently selected higher cost, lower performing, revenue sharing investment options, that reduced Plan participants retirement funds as compared to readily available alternatives.

4.      Plaintiffs bring this action to obtain the relief provided under ERISA § 409, 29 U.S.C. § 1109, for losses suffered by the Plan resulting from the Defendants' fiduciary breaches and prohibited transactions described below, and for other appropriate equitable and injunctive relief under ERISA § 502(a)(3), 29 U.S.C. U.S.C. § 1102(a)(3).

## II. JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA Section 502(a), 29 U.S.C. § 1132(a).

6.      Venue is proper in this judicial district pursuant to ERISA Section 502(e), 29 U.S.C. § 1132(e) and 28 U.S.C. § 1391, because Plaintiffs Keely Vondell, David Jones, and Keith Wilcox reside in this District and worked for Defendant Turning Stone Enterprises LLC in this District.

### III. THE PLAN

7.      The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A), a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34), and a qualified plan under 26 U.S.C. § 401.

8.      According to its Investment Policy Statement ("IPS"), the Plan was established to provide eligible employees with the opportunity for a long-term accumulation of retirement saving through employee contributions and, if applicable, employer contributions, as well as associated investment earnings.

9.      The Plan covers substantially all eligible employees of Turning Stone Enterprises, LLC, formerly Oneida Nation Enterprises, LLC (the "Company"). The Company is the Plan sponsor. The assets of the Plan are held by Fidelity Management Trust Company ("Fidelity" or "the *directed* trustee").

10.     At all relevant times the Plan permitted participants to allocate their retirement assets into about one dozen portfolio-building, non-Target Date pre-selected investment options.

11.     At all relevant times the plan qualified as a large plan. The Plan Sponsor managed approximately $150M - $200M from 2017-2022.[1]

12.     The assets of the Plan are held by Fidelity Management Trust Company ("Fidelity").

### IV. THE PARTIES

13.     At all relevant times, Plaintiff David J. Jones ("Jones"), by virtue of his employment with Turning Stone Enterprises and participation in the Plan, is or may become eligible to receive

---

[1] At the time of filing the Complaint Turning Stone had not yet filed their 2023 5500 Form due July 31, 2024 (without extension).

additional benefits under the Plan as a result of Defendants' breaches and ERISA violations. Thus, Jones is a participant as defined by ERISA § 3(7), 29 U.S.C. § 1002(7). At relevant times during the Class Period, Jones was invested in the TDF 2025 Fund. As a result of the Defendants' mismanagement of the Plan and violations of ERISA, Jones was subject to excessive fees and underperformance and, as such, suffered financial losses.

14.    At all relevant times, Plaintiff Keely Vondell ("Vondell"), by virtue of her employment with Turning Stone Enterprises and participation in the Plan, is or may become eligible to receive additional benefits under the Plan as a result of Defendants' breaches and ERISA violations. Thus, Vondell is a participant as defined by ERISA § 3(7), 29 U.S.C. § 1002(7). At relevant times during the Class Period, Vondell was invested in the TDF (Target Date Fund) 2060 Fund. As a result of the Defendants' mismanagement of the Plan and violations of ERISA, Vondell was subject to excessive fees and underperformance and, as such, suffered financial losses.

15.    At all relevant times, Plaintiff Keith Wilcox ("Wilcox"), by virtue of his employment with Turning Stone Enterprises and participation in the Plan, is or may become eligible to receive additional benefits under the Plan as a result of Defendants' breaches and ERISA violations. Thus, Wilcox is a participant as defined by ERISA § 3(7), 29 U.S.C. § 1002(7). At relevant times during the Class Period, Wilcox was invested in the disputed available investment options. As a result of the Defendants' mismanagement of the Plan and violations of ERISA, Wilcox was subject to excessive fees and underperformance and, as such, suffered financial losses.

16.    At all relevant times, Defendant Turning Stone Enterprises, LLC, a large company with a with over 5,000 employees, operating in the gaming, hospitality, nightlife, recreation, and dining industries is the sponsor of the Plan per ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B); a party in interest under ERISA § 3(14)(C), 29 U.S.C. § 1002(14)(C); and a Plan fiduciary under

ERISA § 3(21)(A), 29 U.S.C. § 1002(2)(A), to the extent that it appointed members of the Committee and otherwise exercised discretion over the administration and management of the Plan and/or control of Plan assets.

17.    At all relevant times, Defendant the Committee was the Plan administrator under ERISA § 3(16), 29 U.S.C. § 1002(16); a party in interest under ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A); and Plan fiduciary under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), to the extent that it had or exercised discretion over the administration or management of the Plan and/or control of Plan assets.

18.    At all relevant times, Defendants John Does 1-30, as members of the Committee, were parties-in-interest under ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A), and fiduciaries of the Plan under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), to the extent that they had or exercised discretionary authority respecting the administration or management of the Plan, and/or control of Plan assets. Plaintiffs will seek leave to amend the Complaint to name each of these John Does once they ascertain their identities in discovery. The Committee and John Does 1-30 will be referred to collectively as the "Committee."

## V. FACTUAL ALLEGATIONS

**A.    The Committee Violated ERISA's Duty of Prudence.**

**1.    The Committee Lacked a Prudent Process in Selecting Plan Funds**

19.    An ERISA fiduciary has a continuing duty to monitor trust investments and remove imprudent ones.

20.    Likewise, Plan fiduciaries must "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "significantly different costs." Restatement (Third) of Trusts Ch. 17, intro. note (2007); see also Restatement

(Third) of Trusts § 90 cmt. B (2007) ("Cost-conscious management is fundamental to prudence in the investment function.").

21.     Adherence to these duties requires regular performance of an adequate investigation of existing investments in a plan to determine whether any of the plan's investments are improvident, or if there is a superior alternative investment to any of the plan's holdings.

22.     An examination of the cost and fee structure of the Plan shows that the Committee did not have a viable methodology for monitoring or controlling the costs and expenses of its investment options. Modern Portfolio Theory (MPT), Prudent Investor Rule (Restatement (Third) Trusts) and ERISA's prudent expert standards required the Committee to have a prudent methodology for making sure participants' money was spent wisely.

23.     As described below, the Committee failed to institute, follow, and apply processes that are consistent with the competence, skill, effort, and diligence that is required of a prudent fiduciary because the Committee persistently selected funds and share classes that carried higher costs for lower returns.

### a.    The Committee Ignored its IPS Metrics in Selecting Funds and Fund Managers

24.     The Committee's ignorance of its IPS metrics is best illustrated by the Committee's imprudent and inexplicable decisions surrounding the selection and retention of the Harbor Capital Appreciation Fund ("Harbor").

25.     In 2012, the Committee added the Harbor investment to the participants' limited menu of choices of investment (investment menu) despite the fact that the portfolio manager, and thereby all share class of the fund itself, consistently underperformed on all statistical metrics prescribed by the IPS for manager selection and retention, primary Modern Portfolio Theory (MPT) factors and post MPT (information ratio (IR)).

26.     IR allows for review of the manager's skill and performance.

What's a good IR? In simplest terms, the IR shows how much a fund or ETF beat its benchmark index. Examined more closely, the tracking error (the denominator in the equation) reveals the consistency of a fund's returns over time. A market norm for the IR is between 0.4 and 0.6, which is a good range for a fund's potential inclusion in a portfolio . . .. Positive IR ranges: An IR of 0.4 or above is considered good. 0.70 or above is very good. 1.0 or higher is exceptional.[2]

. . . it's important to know how well a fund and its manager are doing against their closest peers and the market as a whole. For that, you'll need a few more tools. The Information ratio is one critical measure individual and professional investors can use to keep an eye on fund performance and fund manager consistency.[3]

27.     The information ratio (IR) uses a different calculation called the "tracking error," or the measure of how much risk is being assumed to generate the fund's returns. The IR can be seen as a measure of the portfolio manager's skill in picking investments (and earning his fee), while the tracking error is seen as a measure of the portfolio's volatility and consistency, typically referred to as the consistency of returns (i.e., the standard deviation of the alpha[4]).

It's the same thinking whether you're managing billions—or just tens of thousands. The beauty of the Information ratio is that in one glance, it gives you a picture of a fund manager's performance relative to a specific benchmark as well as the consistency of its returns over time. . . . the IR is both a measure of a fund manager's skill (picking the right securities) and their performance consistency over time.[5]

28.     However, in 2012, the Harbor fund's information ratio (the time of the Committee's initial selection), showed that the fund's IR over the prior 15 years was a negative zero point zero

---

[2] Brian Dolan, Schwab, *How's That Fund Doing? Check the Information Ratio,* June 20, 2024. https://www.schwab.com/learn/story/hows-that-fund-doing-check-information-ratio?msockid=1c6ed057eeb8610d0d68c500efee60ad

[3] *Id.*

[4] Alpha is thought of as the "active return" on an investment and gauges the performance of an investment against a market index or benchmark which is considered to represent the market's movement as a whole. The "excess return" of an investment relative to the return of a benchmark index is the investment's alpha.

[5] *Id.*

two (-0.02) while it should have been a positive 0.4 to 0.6. The manager's 10-year information ratio was a low 0.13. The 5-year was under the 0.4 acceptable threshold (0.32), and the 3-year earned only 0.07—far below a reasonable norm of 0.4 to 0.6 that would warrant selection.

29.     Over time, these metrics did not improve and illuminate the Committee's lack of prudent processes with regard to investigating and monitoring manager risks and performance after the Committee's original selection of this fund. None of the "Inv" share class ratios (or any of the other three classes) reached the 0.4 level necessary to exhibit skill in 2012 and 2018; thus, the manager of all fund classes should have been avoided.

30.     Further, Morningstar's definition also demonstrates that the manager did not meet the IPS's MPT metrics for selection of managers and should never been selected or quickly eliminated upon imprudent selection.

**Table 1: Harbor did not Meet IPS Metrics**

| Name (data as of 10/1/2018) | Information Ratio 3-year | Information Ratio 5-year | Information Ratio 10-year | Information Ratio 15-year | Information Ratio 20-year |
|---|---|---|---|---|---|
| Harbor Capital Appreciation Inv | 0.07 | 0.2 | 0.26 | 0.16 | 0.03 |

31.     Morningstar's definition of a mutual fund manager skill assessment (information ratio (IR)) "measures the risk-adjusted return of a financial security (or asset or portfolio)." It is more relevant for measuring portfolio managers of *stock* and *bond* investments than the Sharpe Ratio. Continuing with Morningstar (emphasis added):

What is the information ratio? Information ratio measures the consistency of a fund or other investment's outperformance compared with a benchmark. It's risk-adjusted and is a version of the more-common Sharpe Ratio. The *benchmark is used to calculate the Information Ratio whereas the risk-free rate is used for the Sharpe Ratio*. It is defined as expected active return divided by Tracking Error, where active return is the difference between the return of the security and the return of a selected benchmark index, and Tracking Error is the *standard deviation* of the active return. The Information Ratio is often

8

used to gauge the skill of managers of mutual funds, hedge funds, etc. In this case, it measures the expected active return of the manager's portfolio divided by the amount of risk that the manager takes relative to the benchmark. The *higher the information ratio, the higher the active return of the portfolio, given the amount of risk taken, and the better the manager*.

32.     Based on this critical portfolio manager measurement factor, relative to when the Committee's members initially selected this expensive class of shares of the Harbor fund, the manager exhibited no consistent and substantial skill and, thus, could never be trusted to manage the participants' invested wages.

33.     Also, the Committee should never have added this fund to the participants' menu due to excessive fees. The Committee forced participants that selected this option to pay the manager 1.04% per year fee *($104 paid per year on every $10,000 of wages invested; the average participant account balance for the Turning Stone 401k was over $60,000)*. The Harbor portfolio manager's rolling information ratio (IR) performance was lower than (1) the fund's SEC-prospectus benchmark (www.sec.gov/edgar) which also (2) was the Defendants' benchmark given to participants in their annual notices under 29 CFR § 2550.404a-5 ("appropriate broad-based securities market index").  Harbor's information ratio (IR) underperformance caused by high costs and risks was consistent, substantial, and apparent.

34.     The Committee could have used www.morningstar.com to uncover this fact throughout the past decade, which would have revealed that Harbor should never have been included in the Plan in the first place. Thus, the Harbor fund overall, all classes, should have been avoided or eliminated quickly once imprudently selected.

35.     Since the Harbor fund never beat its SEC-prospectus benchmark, the Defendants could have offered the benchmark (Russell 1000 Growth) to its participants, using a benchmark

mutual fund that in addition to generally outperforming the harbor fund, also would have reduced participants' costs by approximately more than 90%.

**Table 2: Harbor Consistently Underperformed its Benchmark**

| Information Ratio, 5 year | 2023 | 2022 | 2021 | 2020 | 2019 | 2018 | 2017 | 2016 | 2015 | 2014 | 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Harbor Capital Appreciation Inv | 0.17 | -0.180 | 0.830 | 0.870 | 0.400 | 0.200 | 0.190 | -0.170 | 0.030 | -0.170 | 0.320 |
| Russell 1000 Growth | 0.62 | 0.260 | 1.320 | 1.350 | 0.870 | 0.600 | 0.380 | -0.060 | 0.440 | 0.200 | 0.750 |

36.     The Defendants caused the Plan to incur excessive Harbor fund management costs each year—regardless of underperformance. The Committee's members should have noted the participants' excessive costs totaling over $1.8M when reading the required prospectus. These unnecessary and excessive costs reduced the total funds in the Plan available to participants.

**Table 3: Total Harbor Costs until 2018**

| Plan year | Participants invested wages | Harbor SEC expense ratio | Harbor SEC turnover cost |
|---|---|---|---|
| 2013 | $15,912,374 | $163,897 | $76,379 |
| 2014 | $20,271,662 | $206,771 | $97,304 |
| 2015 | $21,107,799 | $215,300 | $71,767 |
| 2016 | $22,216,112 | $226,604 | $75,535 |
| 2017 | $20,713,256 | $213,347 | $70,425 |
| 2018 | $26,069,784 | $268,519 | $135,563 |
| *Grand total:* | *$1,821,411* | *$1,294,438* | *$526,973* |

37.     The Committee's imprudent selection of the Harbor fund cost the Plan participant over $2.6M from 2019 to 9/30/2024.

**Table 4: Total Harbor Costs after 2018**

| Plan Year | Participants' Invested Wages | Harbor SEC expense ratio | Harbor SEC turnover cost |
|---|---|---|---|
| 2019 | $22,912,030 | $235,994 | $91,648 |
| 2020 | $28,256,741 | $293,870 | $144,109 |
| 2021 | $35,823,875 | $368,986 | $182,702 |
| 2022 | $38,898,008 | $400,649 | $186,710 |
| 2023 | $22,054,153 | $222,747 | $74,984 |
| 2024 | $31,339,557 | $322,797 | $84,617 |
| *Grand total:* | *$2,609,813* | *$1,845,043* | *$764,770* |

38.     On average, the Harbor fund lost by two hundred basis point (2%) to its benchmark from 2019 to 2024. The participants invested wages totaling 22,912,030 dollars on 1/1/2019. Over that time period, the lost opportunity costs totaled ($6,726,319.70).

**Table 5: Harbor Alpha**

| Fund/Benchmark | Mean/year | 9/2024 | 2023 | 2022 | 2021 | 2020 | 2019 |
|---|---|---|---|---|---|---|---|
| Harbor Capital Appreciation Fund | 18.30 | 22.48 | 53.20 | (37.94) | 15.21 | 53.87 | 32.80 |
| Russell 1000 Growth TR USD | 20.33 | 24.55 | 42.68 | (29.14) | 27.60 | 38.49 | 36.39 |

39.     Unfortunately, the Harbor fund is only one of many funds similarly selected by the Committee's flawed and imprudent processes. The Committee's imprudent processes consistently selected expensive and disadvantageous fund for its Plan participants. Funds that similarly damaged the Plan include but are not limited to: (1) the American Funds EuroPacific Growth, (2) the Carillon Eagle Small Cap Growth, (3) the Fidelity Balanced, (4) the Fidelity Freedom Target Date Funds, (5) the Goldman Sachs Small Cap Value, (6) Loomis Sayles Small Cap Growth, (7) MassMutual Select Mid Cap Growth, (8) the Principal Real Estate Securities, and (9) Virtus Ceredex Mid-Cap Value Equity.

**b.     The Committee Lacked Prudent Processes to Identify the High Risks Associated with the Concentrated Portfolio of the Harbor fund**

40.     Moreover, the Committee seems to have also failed to identify or ignored the excessive costs and risks associated with the high concentration of the Harbor fund.

41.     The Harbor fund (all share classes) only held an average of 61 stocks (from 2013 to 2023). To own a share, in 2012, investors would need to assume risk almost equal to six (6) times the actual alpha return (575% standard deviation)—compared to the manager's preferred and appropriate broad-based securities market index (Russell 1000 Growth TR USD). Despite this

reality, the Committee committed to forcing participants to invest in this risky fund by keeing it on the menu.

42.     However, the Committee's members should and could have noted a trend with the Harbor manager when he bought 71 stocks in 2012, with this concentration risk continuing quarter after quarter in 2012 and beyond.

43.     The Harbor manager put 30% of all investors' cash into ten stocks in 2012, which caused enormous risk. The manager's risk (standard deviation) worsened after 2012 as he concentrated participants' money into ten stocks (54.21% of their dollars as of June 30, 2024). The applicable Russell 1000 Growth Index has held over ten times that number of holdings since its formation.

44.      The concentration of participants' wages in this managed Harbor fund caused massive risk and price swings versus the Russell 1000 Growth Index. The manager's consistent and substantial risks over the years are specified below:[6]

**Table 6: Harbor's Low Diversification**

| Name | Number of stocks in every class of Harbor Capital Appreciation fund | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2023 | 2022 | 2021 | 2020 | 2019 | 2018 | 2017 | 2016 | 2015 | 2014 | 2013 |
| Harbor Capital Appreciation (all classes) | 55 | 55 | 57 | 55 | 56 | 59 | 56 | 62 | 68 | 73 | 73 |

45.     Considering the substantially above-average risk due to concentration, the Committee and Harbor's poor performance on all IPS metrics should have never retained Harbor's services in the first place.

46.     The Committee imprudently selected Mutual funds and other plan investments, with "unskilled" portfolio managers not earning their portfolio manager's compensation. The same

---

[6] Same number of stocks in Admin, Instl, Inv, and Retirement classes.

flawed selection process as with the Harbor Fund was present in selecting the other funds. The Harbor selections deviated from IPS metrics and general prudence that would urge to select the highest performing, lowest costs, less risky options, providing insight into the generally flawed decision-making process of the Committee at a plan level.

47.     The Committee predicated their plan-wide investment decision-making less about adherence to their IPS terms and more on obtaining revenue-sharing and ensuring service providers got paid from their participants' investment earnings.  These actions demonstrated plan-wide imprudent selection processes that were not pecuniary-driven.

### 2.     The Committee Lacked a Prudent Process in Selecting Share Classes

#### a.     The Committee Failed to Investigate the Availability of Lower Cost, Equally or Better Performing Share Classes.

48.     At all relevant times, the investment choices in the Plan during the Class Period were comprised of mutual funds or collective investment trusts.

49.     Shares of a single mutual fund may be offered in different "classes," corresponding to different shareholder rights and costs. All share classes charge fees for managing the investment fund. While the costs may differ, the managers, investment styles, and stocks are identical.

50.     The two most common types of mutual funds are retail funds and institutional funds. Retail class shares are available to a broad spectrum of investors, including individuals, while institutional class shares are typically only sold to larger investors, including 401(k) plans. Institutional mutual funds typically charge lower expense ratios than retail funds, but both use identical management strategies, identical portfolio managers, identical holdings and virtually identical risk characteristics.

51.     A prudent fiduciary must have a viable methodology to monitor and select proper investment options and can easily spot the best share class options for the Plan.

52.     Mutual funds, moreover, are not static, and share classes change over time as lower share classes are issued. Therefore, a fiduciary with a prudent methodology will monitor and evaluate the share classes of the available mutual funds and have established a process to move the Plan's assets into lower cost share classes as they become available.

53.     Low-cost institutional share classes of mutual funds compared to high-priced retail shares are readily available to institutional investors, such as the Plan here, which can easily meet minimum investment amounts for these share classes. Also, the prospectuses indicate that minimums are waived when the funds were held in trust (by defined contribution plans).

54.     Here, however, the Committee, throughout the Class Period, repeatedly failed to monitor investments, explore, and consider the lowest cost share class options for investments in the Plan, and follow other risk and reward metrics in the Plan's Investment Policy Statement (IPS).

55.     Instead, the Committee deliberately selected and thereafter retained the most expensive share classes of a fund even though identically managed, less costly, higher yielding, higher returning share classes of the same fund were available. The Committee's consistent and inexplicable selection of worse performing options is evidence of a lack of a prudent selection process.

56.     The governing body overseeing mutual funds, the SEC's Office of Investor Education and Advocacy, states:

> "Some mutual funds offer investors different types of shares, known as "classes." Each class invests in the same portfolio of securities and has the same investment objectives and policies. However, each class has different shareholder services and/or distribution arrangements with different fees and expenses. Because of the different fees and expenses, each class will likely have different performance results."[7]

---

[7] https://www.investor.gov/introduction-investing/investing-basics/glossary/mutual-fund-classes

"The more fees you pay, the less money is invested in the mutual fund share class and the less you will earn – now and over time. So, it is important that you invest in a mutual fund class that is appropriate for your financial situation and that you understand the fees associated with that share class. Also, the appropriate share class for you might change over time, for example, as your financial situation changes, or as new mutual fund classes are introduced."[8]

57.    Therefore, all the classes are identical except for their associated costs.

> **b.    The Committee Lacked Processes to Avoid Imprudent Investment in the Highest Cost Class of the Harbor fund.**

58.    The Committee's IPS, Section 5 (pages 5 and 6), specifically states how the Committee should endeavor to measure investment risk when applying their experience and expertise. It states, "Other risk measures and ratios, including sharp ratio, information ratio and beta, may be used as well." Nevertheless, the Committee acted in the polar opposite way, by selecting the worst-performing class of shares offered by Harbor (and other funds) in all metrics.

59.    In 2012, the Committee failed to employ prudent processes when they added the retail class of the Harbor Capital Appreciation fund. Their chosen share class burdened participants with an annual expense ratio that was over 100 basis points (1.04%). It was the Plan's largest fund during the Class Period (Harbor Capital Appreciation Inv), and the Committee kept the expensive share class while identically managed institutional retirement classes of the fund charged forty percent less (same manager, same holdings, same cost-basis, etc.). This is illustrated in the chart below.

**Table 7: Harbor 2012 Expense Ratio of Share Classes**

| Name | Expense ratio (2012) |
|---|---|
| Harbor Capital Appreciation Admin | 0.91% |
| Harbor Capital Appreciation Instl | 0.66% |
| Harbor Capital Appreciation Inv (Defendants' class) | 1.03% |

---

[8] Updated Investor Bulletin: Mutual Fund Classes | Investor.gov

60.     Even though it should have been apparent to the Committee that choosing identical funds at higher costs would be imprudent, they nonetheless chose the most expensive funds costing the participants $218,400 that year and a total of $1,310,400 for the following six Plan years from 2013 to 2018.

61.     To make matters worse, the Committee was eligible at all times to pick up their phone and exchange to a more favorable share class that would have been identical but for the extra costs associated with the share class the Committee selected from the outset.

62.     These extra costs meant that the Plan participants' accounts were harmed not only by that amount, but also by the compounded losses thereafter, all due to the Committee's flawed decision-making processes. A prudent process would likely have increased the Plan's values by millions of dollars. The participants' wages were wasted on excessive costs when the same services were available at the same fund for a lower price.

<blockquote>
c.      <b>The Committee Lacked Processes to Avoid Imprudent Investment in the Lowest Performing Class of the Harbor fund</b>
</blockquote>

63.     In addition to the higher costs associated with the share class selected by the Committee, their selection also performed worse across all statistical metrics as demonstrated by the Plan year 2012 IPS metrics like in the table below. This data was available to the Committee's members in each plan year.

<b>Table 8: Harbor IPS Metrics 2012</b>

| <i>All IPS risk and reward metrics worsen for classes with increased class costs.</i> | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Name (data from 2012) | Sortino 1-year | Alpha 3-year | Sortino 3-year | Information Ratio 3-year | Alpha 5-year | Sortino 5-year | Sharpe 10-year | Information Ratio 10-year |
| Harbor Capital Appreciation Instl | 0.05 | 0.33 | 1.62 | 0.38 | 0.22 | 0.08 | 0.04 | -0.05 |
| <i>Harbor Capital Appreciation Inv</i> | <i>0.01</i> | <i>0.3</i> | <i>1.57</i> | <i>0.32</i> | <i>0.19</i> | <i>0.05</i> | <i>0.02</i> | <i>-0.11</i> |

64.     IPS performance information like the above requires a trustee to choose the class with higher numbers, not lower ones, yet the Committee chose and stuck with the lower performing Harbor Inv class with higher costs and lower performance across all metrics for more than a decade.

65.     Following common sense, ERISA, the spirit of common trust law, and the Plan's policy's written terms required that the Committee *avoid forcing participants to buy more expensive, lower-yielding classes*. The investment was also imprudent over time and was otherwise clearly unsuitable for the goals of the plan's IPS based on underperformance.

66.     The Committee deviated from its selection metrics and violated common sense and their fiduciary obligations to maximize the retirement funds of their Plan participants.

### d.      The Committee Exhibited the Same Flawed Class Share Selection Process Across Multiple Funds

67.     Further, the Committee's process in dealing with Harbor is not a singular and temporary lack of common sense and judgment, but instead an example of the Committee's consistent and patently imprudent process spanning more than a decade.

68.     The Committee's consistently failed to follow its IPS or generally follow a prudent process to not select the least beneficial share classes for their Plan participants.

69.     For example, the Committee exhibited the same flawed selection process with American Europacific Growth Fund ("AEG").  Here again, the Committee chose a share class option that underperformed on all IPS metrics and carried higher costs and fees and lower performance:

**Table 9: AEG IPS Metrics**

| Name (data as of 6/30/2018) | Yield 12-Mo | Expense Ratio | 12b-1 Fees | No-Load | Info Ratio 1-year | Info Ratio 3-year | Info Ratio 5-year | Info Ratio 10-year | Info Ratio 15-year |
|---|---|---|---|---|---|---|---|---|---|
| American Europacific R4 (Committee's Choice) | 0.65 | 0.83 | 0.25 | N | 0.52 | 0.30 | 0.53 | 0.51 | 0.36 |
| American Europacific R6 (Same stocks, mgr) | 0.99 | 0.49 | 0.00 | Y | 0.63 | 0.40 | 0.63 | 0.60 | 0.43 |

70.    To prudently follow the IPS, common sense, and ERISA, the Committee and should have compared the American Europacific Growth fund ("AEG") class yields (column 2), expenses (column 3), and more critical to the IPS' terms, the information ratio (IR) columns. The data clearly shows that the Committee should have chosen the R6 class due to higher information ratio (IR) numbers, lower expense, fees, and higher yields. Nevertheless, the Committee, continuing the pattern of poor selection, chose the less beneficial option for its Plan.

71.    Even if the Defendants gave all the revenue-sharing back to employees investing in the loaded R4 share class, investors would still have been damaged because balances would have been more significant if given the chance to earn the returns of the cheaper share class (R6).

72.    Just like with Harbor, the Committee seems to have ignored its IPS metrics and chose the less economical option for its Plan Participants. The Committee must have focused (again) on non-pecuniary aspects for selecting/retaining investments, such as revenue-sharing dollars, hurting the plan participants in the process.

73.    In that same vein, the Committee also chose the suboptimal share class for the Plan participants from the JPMorgan Value Advantage fund.

**Table 10: JPMorgan IPS Metrics**

| Name | Yield 12-Month (as of 9/30/24) | Expense Ratio | Management Co. ID |
|---|---|---|---|
| JPMorgan Value Advantage L (Committee's choice) | 1.44 | 0.74 | 0C00001ERQ |
| JPMorgan Value Advantage R6 | 1.53 | 0.55 | 0C00001ERQ |

74.     Similarly, the Committee chose the suboptimal share class Fidelity Freedom 2035 ("FF35") fund the Committee also chose the worse performing and more expensive revenue sharing share class over better options.

75.     The Committee's decision-making with Harbor, FF35, JPMorgan, and AEG funds shows their consistently systematically flawed imprudent process, selecting the more expensive and less yielding option that included revenue sharing.

76.     The Committee's consistent selection of less favorable options for their Plan participants on a plan-wide basis shows that they failed to follow a prudent selection process. The Committee's choices place into question whether the Committee considered the interests of its plan participants above all else.

### 3.     The Committee Lacked Prudent Processes in Monitoring the Fund's Performance

#### a.     The Committee Failed to Monitor Fund Underperformance and Take Action to Exchange for Available Better Performing Options

77.     After consistently selecting less favorable and imprudent options for their Plan participants, the Committee also failed to recognize and remedy these selections, or deliberately disregarded its past mistakes.

78.     The Committee allowed Plan participants to invest their wages in more expensive and lower performing classes, instead of the corresponding index mutual funds on a plan-wide basis. Matching the appropriate broad-based securities market indexes would have (1) put less risk of the participants invested wage dollars, (2) offered more return on for the wages invested, and (3) conformed with the IPS.

79.     The Committee's lack of a prudent process, compliance with ERISA, and violation of fiduciary duties in monitoring the Plan's investments is best illustrated by the Committee's

inability or disregard to recognize the decade long underperformance of their selected Harbor share class as compared to all other Harbor share classes.

80.    If the Committee followed the IPS metrics and reviewed its Harbor investment in 2019, given that the following data demonstrating the underperformance was included in the 2019 prospectus:

**Table 10: Harbor as Compared to its Benchmark 2019**

| Name (2019 data) | Symbol | Information Ratio 1-year | Information Ratio 3-year | Information Ratio 5-year |
|---|---|---|---|---|
| Harbor Capital Appreciation Inv | HCAIX | 0.24 | 0.96 | 0.39 |
| Vanguard Russell 1000 Growth Index I | VRGWX | 1.77 | 1.51 | 0.91 |

81.    The above data demonstrates even to an untrained eye that the Harbor managed mutual fund was underperforming its benchmark (at www.sec.gov/edgar) and equivalent mutual fund index (the Vanguard equivalent mutual fund). This fact is only made worse by the fact that the mutual fund option is also substantially cheaper. Specifically, it would cut participants' investing costs down from 104 basis points (for Harbor) to 5-10 basis points (for the Vanguard equivalent index fund) and would have improved the participants' accounts' growth dramatically.

82.    Moreover, if the Committee's members had applied their selection and monitoring criteria in their IPS prudently, as they were supposed to, they would have found dozens of other large cap growth managed alternatives that better conformed to the selections/retentions IPS metrics.

83.    Along the same line, the underperformance of the Harbor Inv class was apparent by simply using Excel's future value function to calculate lost growth against the prospectus and employees 29 CFR § 2550.404a-5 annual notice's benchmark index Russell 1000 Growth TR

USD. The fact that since 2018, year after year the Harbor retail class underperformed the IPS selected benchmark substantially at all relevant times and no action was taken is inexplicable.

84.     The therefrom resulting losses to the Plan participants are tremendous. To illustrate the sheer scope the losses of the Plan, hypothetically, if the $26,000,000.00 of wages were invested in the benchmark index instead of Harbor's retail class, the participants' funds would have had $5,026,846 more dollars in the Plan by 2023. This underperformance is clear and apparent and could have been discovered by the Committee by simply using Excel's future value function to calculate lost growth given the performance of Harbor's retail class and the IPS selected benchmark.

85.     Alternatively, the Committee could have also chosen to exchange the expensive and underperforming Inv class to any other class offered by Harbor to mitigate the lost earnings of the Plan participants to at least some degree. It is mindboggling that no such action occurred.

86.     At all relevant times, the Harbor fund's price and the Trust's value overall, along with current and terminated participants' prior account balances and cashouts (from 2012 to present), would have been higher if the Committee had properly monitored its investments and avoided unwarranted costs of the underperforming Harbor Inv Class.

87.     For example, on 9/30/2024, Harbor's Inv class was priced at $108.85 per share, while the cheaper Harbor Capital Appreciation Admin class was priced higher at 113.32 dollars. Moreover, the Harbor Capital Appreciation Instl share class was even more valuable to participants at $118.51. Finally, the "Retirement" class, designed for 401k plans like the Plan, had the highest price at $118.92 per share (over ten dollars more per share). For 12 years the Committee wasted the participants wages on the Inv share classes that at all relevant times cost more and performed

lower. Again, regrettably no action to improve the Plan participants' position at Harbor was taken at any time.

88.     To make matters worse, the Committee could have exchanged their retail Inv class for the cheapest, highest yielding, and highest returning Retirement class at any time by calling 800-422-1050. That class of shares is called Retirement because it was designed for use in retirement plans like the Plan at issue here, yet that was still not enough to tip off the Committee.

89.     The Committee's members failed to act to exchange hundreds of thousands of Harbor shares for the ten-dollar higher priced Retirement class. Therefore, they cost participants' accounts millions of dollars because the Plan held hundreds of thousands of shares

90.     Particularly, since its launch in 2016, the Committee's selection underperformed the retirement class by the largest margin year after year.

**Table 11: Harbor IPS Metrics 2018**

| Name (data as of 6/30/2018; higher is better) | Sortino 1-year | Alpha 3-year | Sortino 3-year | Information Ratio 3-year | Alpha 5-year | Sortino 5-year | Sharpe 10-year | Information Ratio 10-year |
|---|---|---|---|---|---|---|---|---|
| Harbor Capital App Retirement | 6.47 | 1.70 | 1.94 | 0.50 | 3.28 | 2.64 | 0.80 | 0.34 |
| Harbor Capital App Inv | 6.27 | 1.28 | 1.87 | 0.43 | 2.87 | 2.56 | 0.78 | 0.27 |

91.     Given several outperforming options, the Committee nevertheless continuously stuck with the lowest performing option. The Committee's historical investment choices make it clear that they lacked prudent processes and lacked adherence to its Plan's IPS terms every step of the way. They violated the letter and spirit of their IPS by choosing the Harbor class with the highest cost and lowest performance every single year.

92.     No prudent fiduciary would purposefully continue to invest in the higher-cost, lower-performing retail shares that underperform prescribed IPS metrics in all categories as compared to the alternatives.

93.     Likewise, the Committee also failed to remedy other underperforming funds on a plan-wide basis just like they did at Harbor.

**B.    The Committee Violated ERISA's Duty of Loyalty by Taking Kickbacks from Employee Wage Investments**

    **1.    The Committee's Preference for Revenue Sharing Dollars Created Millions of Lost Dollars in Opportunity Costs for Plan Participants While Benefiting Turning Stone Though the Therefrom Resulting Kickbacks**

94.     The governing body overseeing mutual funds, the SEC's Office of Investor Education and Advocacy, issued an Investor Bulletin to provide investors with information about revenue-sharing classes of mutual funds, stating,

> Some mutual funds offer investors different types of shares, known as "classes." Each class invests in the same portfolio of securities and has the same investment objectives and policies. But each class has different shareholder services and/or distribution arrangements with different fees and expenses. Because of the different fees and expenses, each class will likely have different performance results.[9]

95.     The Office of Investor Education continues with:

> *The effect of different fees on different mutual fund share classes is compounded over time.* * * * The more fees you pay, the less money is invested in the mutual fund share class and the less you will earn – now and over time.[10]

96.     Turning Stone's average participant account size on 1/1/2023 was over $60,000 (i.e., $68,286). The Committee's largest retained investment was Harbor Capital Appreciation. Based on the Committee's Form 5500 "Schedule C (Form 5500) 2022," the Committee's chosen Inv class has a revenue-sharing fee of forty dollars per ten thousand or forty basis points (0.4%)

---

[9] https://www.investor.gov/introduction-investing/investing-basics/glossary/mutual-fund-classes

[10] https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-bulletins-61

per year. Thus, a Plan investor who puts $30,000 into the Harbor Capital Appreciation Inv class must have $120 taken in a plan year to pay Fidelity for record keeping.

97.    The Committee's choice since 2012 of the Inv class of the Harbor funds means they chose and kept this class of the Harbor fund based on nonpecuniary or non-economic reasons in violation of ERISA. Upon information and belief, the only logical explanation is that Turning Stone wanted to avoid an invoice from Fidelity because that was the only difference between their retail classes selected by the committee on a plan-wide basis and the less costly, higher returning institutional and or retirement classes.

98.    The Defendants' "fiduciary hat" was on, and thus so was ERISA's requirement that Turning Stone's decision-making be made "solely in the interest" and for "the exclusive purpose" of benefiting participants. Choosing to avoid to deal with an invoice at the expense of the Plan participants patently violates their fiduciary duty as the Committee had a duty to avoid placing the company's interests above that of the Plan participants.

99.    Loyalty is the most sacred of ERISA's foundational principles. Such a blatant failure to operate the Plan and Trust in an impartial fashion under common trust law rules is indicative of gross negligence or bold disloyalty of the Committee.

     **b.    The Committee Ignored its IPS and Violated its Fiduciary Duty of Loyalty to Plan Participants in Choosing Revenue Sharing Investment Options that Benefit Turning Stone at the Cost of the Participants**

100.    Upon information and belief, Turning Stone selected revenue sharing classes against their own IPS selections and retention criteria because it allowed the company to avoid dealing with an invoice from Fidelity. That is, all the Committee's chosen revenue-sharing classes had worse Sharpe ratios, worse Alphas, worse Sortino ratios, worse Information ratios (IR), and

so on across every possible IPS metric an investor might utilize to choose the best mutual funds and the best class of funds for the Plan and Trust.

101.    The Turning Stone Enterprises' IPS states: "The IPS is drafted consistent with applicable standards of ERISA and is intended to help the Fiduciaries comply with their duties under applicable law, the standards of ERISA Section 404(c) and subsequent standards of any applicable regulations promulgated under such section."

- Thus, fund or investment selections and retentions based on any form of revenue-sharing violate the IPS written terms. More specifically, the following related words were not contained in the Plan's IPS: (1) "revenue," (2) "share," (3) "sharing," (4) "12b-1," and (5) "sub-transfer agency."

102.    These words are omitted as a selection or retention factor because they do not comply with page 2, section 2, "Policy Goals & Objectives." Revenue-sharing is a non-pecuniary or non-economic *cost* factor that causes more expensive classes of funds to report worse (lower) yields, lower interest payments, lower dividends, and lower realized and unrealized gains versus the identically managed, non-revenue-sharing class of the same fund.

103.    In Harbor Inv class, participants lost one percent per year over the past 5 years because of the negligent plan-wide decision-making by the Committee. Based on the fund's prospectus returns, the Committee's class "Inv" earned one percent less than the "Retirement" class (26.4% versus 27.4% per year over the past 5 years as of 9/30/2024). Defendants often say they direct the forty basis points in revenue-sharing back into participants' accounts after a few quarters. But even if the Committee gave forty basis points back immediately, the participant would still be harmed by the choice of this class (sixty basis points). Cheaper classes have less taken from participants each day; thus, that remaining amount grows (compounds).

**Table 12: Excessive Costs of Revenue Sharing**

| Name | Expense Ratio | 1 yr Return | Managers | Manager Start Date | Number of Holdings |
|---|---|---|---|---|---|
| Harbor Capital Appreciation Inv | 1.04 | 26.4 | McCarragher/Boyer/Kuhlkin | 3/1/2013 | 51 |
| Harbor Capital Appreciation Retirement | 0.6 | 27.4 | McCarragher/Boyer/Kuhlkin | 3/1/2013 | 51 |

104.    Similarly, the same issue of choosing more expensive and lower performing revenue sharing options occurred with the Committee's other selections and is evidence of a plan-wide decision-making issue.

105.    For the AEG fund, the yield in 2018 for their chosen R-4 class was sixty-five basis points (0.65%), while the R-6 yielded one percent (1% or one hundred basis points per year). The Committee's members failed to act to exchange to the higher priced (NAV) and higher returning R-6 class.

106.    The only difference between the two classes was the thirty-five basis points in revenue-sharing credits. Thus, the only logical basis for selecting and forcing participants to buy the *less* economically beneficial R-4 class was that the Committee placed the interests of Turning Stone above that of their Plan participants.

107.    Because of more fees, the Committee's funds with revenue-sharing have lower fund prices or net asset values (NAVs) than their cheaper, identically managed classes. Because participants' accounts are updated at 4 pm each day to reflect the NAV for each share they own, their account balances were harmed daily and understated (account balances equal the number of shares times that share class's price). Thus, the Committee deliberately harmed or reduced the overall Plan and trust's value through these repeated actions or failures to act.

108.    The tables below contain prospectus information for classes of another fund that Turning Stone selected (before 2009)—and they never acted to switch to the identically managed

but cheaper class (R-6). The Defendants' R-4 version price or net asset value (NAV in the first row in *italics*) was always lower (less valuable) than its sister R-6 class. Thus, lower dollars in the participants' accounts every year, every quarter, and every day.

**Table 13: AEG Net asset values (NAVs)**

| Name & NAV | 2023 | 2022 | 2021 | 2020 | 2019 | 2018 | 2017 | 2016 | 2015 | 2014 | 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| *American Funds EuroPacific Growth Fund® Class R-4* | *53.34* | *47.85* | *63.25* | *67.84* | *51.76* | *44.12* | *54.38* | *44.25* | *48.99* | *48.48* | *48.18* |
| American Funds EuroPacific Growth Fund® Class R-6 | 54.70 | 49.03 | 64.73 | 69.30 | 52.82 | 44.99 | 55.48 | 45.04 | 49.90 | 49.38 | 49.03 |

109.    The expense ratios below were also consistently and substantially lower for the shunned R-6 class, which the Committee had never exchanged since 2009 or before.

**Table 14: AEG Expense Ratio Comparisons**

| Name & Expense Ratio | 2023 | 2022 | 2021 | 2020 | 2019 | 2018 | 2017 | 2016 | 2015 | 2014 | 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| *American Funds EuroPacific Growth Fund® Class R-4* | *0.82* | *0.81* | *0.81* | *0.81* | *0.84* | *0.83* | *0.85* | *0.85* | *0.84* | *0.85* | *0.85* |
| American Funds EuroPacific Growth Fund® Class R-6 | 0.47 | 0.46 | 0.46 | 0.46 | 0.49 | 0.49 | 0.50 | 0.50 | 0.49 | 0.50 | 0.50 |

110.    The table above with prospectus-derived expense ratios coupled with the figures below (from the Committee's 2022 Form 5500 Schedule C) depicts the sole difference between these Committee's classes. The Committee's (1) chosen class, R-4,  credited them with the net difference in dollars derived from the lost earnings taken from their participants' accounts over each business day of the year (i.e., revenue-sharing; based on evidence from their Forms 5500 Annual Returns/Reports of Employee Benefit Plan).

111.    The same disloyal selection happened with the JPMorgan and FF35 funds and other funds on a plan-wide basis.

112.    For example, facts about the participants' only managed large-value stock mutual fund on the menu are depicted below. The Form 5500 shows kickbacks to Turning Stone again from the more costly JPMorgan "L" class, which reduced participants' yields. Yields make up half of a stock fund's total return.

113.    Revenue-sharing again hurts participants' returns immediately, grows worse, and expands over time compared to returns from the class without revenue-sharing. Lost opportunity costs to Plan participants will invariably dwarf any benefits of credits that harmed participants might someday receive.

**Table 15: JPMorgan Expense Ratio**

| Name | Yield 12-Month (as of 9/30/24) | Expense Ratio | Management Co. ID |
|---|---|---|---|
| JPMorgan Value Advantage L (Committee's choice) | 1.44 | 0.74 | 0C00001ERQ |
| JPMorgan Value Advantage R6 | 1.53 | 0.55 | 0C00001ERQ |

114.    The Committee consistently prioritized revenue sharing that hurt the Plan participants retirement value and benefited only Turning Stone on a plan-wide basis, violating their duty of loyalty to the Plan participants.

115.    The Committee knowingly or recklessly sacrificed millions of dollars of the Plan participants in exchange for revenue share that favors the company's desire to avoid dealing with record keeping costs over the the wellbeing of the Plan.

**c.    Committee Incurred Excessive Fees by Choosing Revenue Sharing Investment Options**

116.    Recordkeeper costs can be paid "per capita" (aka per participant) or "pro-rata" or based on a percentage amount of dollars a participant has in their account. Share classes of mutual funds are listed on the same page of the SEC-prospectus at www.sec.gov/edgar. Thus, Defendants

do not need to spend time searching through an investment universe to ensure the best and more beneficial share class of a mutual fund.

117.    The Harbor Inv and Retirement share class are listed at the beginning of each prospectus—usually on the same page. All costs and returns are illuminated in columns. Trustees must focus solely on "financial" rather than "nonpecuniary" benefits like revenue-sharing. The "benefits" to be pursued by ERISA fiduciaries as their "exclusive purpose" do not include "nonpecuniary benefits." (*Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 421 (2014)). The corollary principle is that ERISA fiduciaries must never sacrifice investment returns, take on additional investment risk, or pay higher fees to promote non-pecuniary benefits or goals.

118.    ERISA plan fiduciaries may not subordinate investment returns or increase risks to promote non-pecuniary objectives. The duty of loyalty—a bedrock principle of ERISA with deep roots in the common law of trusts—requires those serving as fiduciaries to act with a single-minded focus on the interests of beneficiaries. See Unif. Prudent Inv. Act section 5 cmt. (1995).

119.    Only reasonable compensation can be paid for necessary services under ERISA. Revenue-sharing (SEC Rule 12b-1 fees, subtransfer agency fees, shareholder servicing fees, commissions, finder's (incentive) fees or other types of fees) reduces an investment's returns daily that investors receive, making recordkeeping and other administrative costs interdependent with plan participant returns. A prudent fiduciary would switch to identical lower-cost share classes immediately. Switching from a revenue-sharing to a per capita expense model would gave been a greatly beneficial way of reining in excessive expenses.

120.    When selecting investments for a retirement plan, plan fiduciaries are required to: act with undivided loyalty; prudence; and defray reasonable plan expenses. ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1). In addition, ERISA prohibits certain transactions and arrangements that have

a high potential for abuse. Thus, ERISA prohibits a fiduciary from causing a plan to transact with a party in interest, such as the plan sponsor, and prohibits plan fiduciaries from causing plan transactions for the benefit of themselves or others. ERISA § 406(a)-(b), 29 U.S.C. § 1106(a)-(b).

121.    Prohibited transaction claims under ERISA § 406(a) are per se violations of ERISA and, thus, not derivative of breach of fiduciary duty claims. Likewise, ERISA § 406(b) is broadly construed and liability be imposed even where there is no taint of scandal, no hint of self-dealing, no trace of bad faith.

122.    At all relevant times, Defendants were named and/or de facto fiduciaries of the Plan within the meaning of ERISA insofar as they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets. Defendants who are or were fiduciaries to the Plan during the Class Period have violated their fiduciary duties and engaged in prohibited transactions with Plan assets.

123.    The Committee's members could have also discovered the excessive costs and the impact of such costs by using the free FINRA research tool that analyzes mutual funds. The FINRA tool is available to help protect America's investors from selecting disadvantageous options. With only a couple of button clicks the Committee could have discovered their imprudent selection.

**Table 16: FINRA Fund Analyzer of Harbor**



124.    The figure above demonstrates on hand of a hypothetical period of ten years using a $10,000 initial investment and with a default rate of five percent (5%) per annum the most higher costs associated with the Committee's selection. The cost difference is staggeringly high, approximately 69% of difference in costs. Thus, in this scenario the future value of the Inv class was $14,680.09 while the same fund, the cheaper Retirement class, grew to $15,340.41.

125.    The U.S. Securities and Exchange Commission (SEC) reminds plan fiduciaries, *"The effect of different fees on different mutual fund share classes is compounded over time. * * ***

The more fees you pay, the less money is invested in the mutual fund share class and the less you will earn–now and over time."[11]

### d. The Committee's Disloyal Conduct in Selecting Revenue Sharing Options Reduced Participants' Investment Growth

126.    Despite revenue sharing demonstrably hurting the participants investment growth, Turning Stone directed their participants' Harbor fund (and other funds) returns to be reduced by revenue sharing. Before disbursement, if any, the Committee authorized Fidelity to use these monies to pay their "required recordkeeper revenue," resulting in millions of dollars in lost opportunity costs for participants. A more prudent arrangement, in this case, would have been to select available lower-cost investment funds that used little to no revenue sharing and for the Defendants to negotiate and/or obtain reasonable direct compensation per participant recordkeeping/administration fees. The Committee chose the only Harbor share class that included the revenue-sharing opportunity cost.

127.    Defendants allowed Fidelity to hold the participants' revenue-sharing dollars for a prolonged period of time and failed to timely remit any excess revenue-sharing back to Plan participants. This was a further fiduciary breach that cost Plan participants millions of dollars during the Class Period. Thus, Turning Stone Enterprises failed to monitor or control the grossly excessive compensation paid for recordkeeping.

128.    This would have been prevented if Commiteee  chose the cheaper, faster growing, higher yielding and more economically beneficial institutional class—which was using the same portfolio manager who managed the same stocks/bonds in the same proportion of the more expensive retail share class.

---

[11] https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-bulletins-61

129.    While an investment company's operations are not covered by ERISA, the statute does affect investment companies in two respects. First, when a plan invests in an investment company, ERISA provides that the plan assets do include the securities issued by the investment company and acquired by the plan. Consequently, a decision to purchase, hold, or dispose of mutual fund shares is subject to the prohibited transaction rules. Thus, for example, an arrangement under which a plan invests in, or retains an investment in, an investment company in the expectation that the investment company will purchase securities from a party in interest is a prohibited transaction under Section 406 of ERISA. Second, ERISA regulates any payment of fees to fiduciaries, affiliates of fiduciaries, or parties in interest that may result from the plan's investment in the mutual fund, such as investment advisory fees, principal underwriting fees, custodian fees, shareholder service fees or Rule 12b-1 fees.

130.    To deal with the issues that may arise from plan investments in investment companies and from relationships between the plan and persons affiliated with investment companies, the Agencies have issued a series of class exemptions (and several individual exemptions).

131.    Here, the Committee was addicted to finding and using revenue-sharing credits that benefit others at the expense of the Plan.

132.    By selecting high-cost investments with revenue sharing so that it could use a portion of the invested wages to pay inflated fees, the Committee acted to save dollars for Turning Stone at the expense of Plan participants and/or to favor its recordkeeper over the Plan participants and the trust.

133.    The Committee knew or should have known, about the excessive nature of these fees at all pertinent times. The Committee could have achieved these enormous cost savings

throughout the Class Period, based upon a cursory examination of the marketplace for defined contribution products, but chose not to look or, instead, to ignore the way Plan participants were having their retirement savings slowly eroded *en masse* by excessive fees.

134.    The Committee's historical investment choices show that they lacked prudent processes to adhere to its plan document IPS terms every step of the way. They violated the letter and spirit of their IPS by choosing classes that offered revenue-sharing credits that the Committee could use later to pay provider bills. Extra costs are directly correlated to their participants' lowered returns, which caused a lowered price/NAV to be allocated every evening on Fidelity's website.

**C.    The Committee Engaged in Prohibited Transactions with CapTrust**

135.    ERISA § 406, 29 U.S.C. § 1106 prohibits unnecessary fees and transactions between interested parties.

136.    The Committee engaged in ERISA prohibited transactions with CapFinancial Partners, LLC and CapFinancial Partners, LLC ("CapTrust") by paying them for unnecessary services from the participants and the trust.

137.    ERISA only permits an exemption for deductions from Plan and Trust assets. In the case of CapTrust, they are potentially allowed to receive compensation from the trust if they perform services for participants that are necessary for the Plan's operation *and beneficial to participants*.

138.    At some relevant time, the Committee authorized CapTrust to directly deduct from the Plan participant accounts about $52,000 on average, in annual direct trust compensation (Committee's Forms 5500 show payments to CapTrust). This makes CapTrust, a de facto fiduciary who aided the Committee to choose imprudent investments.

139.    CapTrust was the Plan's consultant who advised the Committee's members to add and retain these funds discussed above and other imprudent investments (and the classes) since 2015. Therefore, CapTrust did not earn these trust dollars because they were not necessary for the operation of the Plan. CapTrust should have never been hired or paid.

140.    CapTrust alienated, at the direction of the Committee, over $258,000 since 2018 of trust assets beneficially belonging to the participants ($58,817; $59,957; $61,430; $47,012; $31,469 (for the calendar plan years of 2018 to 2022)).

141.    CapTrust developed the IPS and aided the Committee's members in choosing expensive and underperforming Plan investments. A party-in-interest can get paid from the trust's assets (like CapTrust did) only if the appointment is valid, their services add value to participants, and no more than reasonable compensation is paid.

142.    The maximum hourly rate allowed by the U.S. Department of Labor of about 400 dollars is close to the brokerage industry's usual, customary and reasonable hourly rates of $300 per hour (i.e., Fee Benchmarker® (Advisor Fee Almanac, 6th Edition)). Thus, CapTrust's pay was unreasonable and not exempt from ERISA prohibitions—not to mention they helped select plan investments that were thoughtless, irresponsible, and negligent.

143.    First, CapTrust's services were detrimental and unnecessary for the Plan's operation. Many plans have only committees running their plans without using a broker or advisor.

144.    Second, even if their actions never harmed the participants, the reasonable compensation for performing services like (1) one-time IPS assistance, (2) two Zoom reviews per year, and (3) producing four quarterly monitoring reports means CapTrust's compensation was not reasonable. Typical investment advisory firms spend about four hours per quarter on reporting and

about ten hours twice yearly consulting directly with their clients. Therefore, 36 hours at $300 per hour equals $10,800 in time.

145.    Doubling those hours for a nice profit still puts CapTrust's pay at under $25,000 per year. However, CapTrust's average pay was $52,000, so they were paid at least twice what was earned. The Plan's IPS indicates that CapTrust is only an investment *consultant*—not an investment *manager* (CapTrust services are under ERISA § 3(21)). Less often, an advisory firm will work under the investment *manager ERISA § 3(38) where the firm accepts responsibility for their recommendations to a plan Committee.* Investment managers get paid more than consultants as managers are responsible for their recommendations and are sometimes, therefore, paid based on assets.

146.    CapTrust does not have liability for their recommendation as fund additions and subtractions are solely the responsibility of the Plan's Committee and Turning Stone. They file a corporate resolution with Fidelity to direct changes to the participants' menu (not CapTrust). Plan advisory services compensation varies slightly year over year, although, for consultants, it should be level and based on time and materials—not plan size. However, for example, the 401k for Maher Terminals LLC was charged during 2018 to 2022 only $17,507, $18,053, $18,575, $14,342, and $24,496, respectively, for CapTrust's consulting services.

**Table 17: CapTrust's Average Pay for Plan Services**

| Table 3: Sponsor Name | Provider Name | Form 5500 Service Code | Direct Compensation | Total Plan Assets | Participants: Total |
|---|---|---|---|---|---|
| AAA COOPER TRANSPORTATION | CAPFINANCIAL PARTNERS LLC | 27 Investment advisory | 24,971 | 276,395,171 | 6,077 |
| AMERICAN DENTAL ASSOCIATION | CAPFINANCIAL PARTNERS LLC | 27 Investment advisory | 32,274 | 104,972,417 | 633 |
| ARENTFOX SCHIFF LLP | CAPFINANCIAL PARTNERS LLC | 27 Investment advisory | 12,500 | 196,685,368 | 1,317 |
| ASPLUNDH TREE | CAPFINANCIAL | 27 | 18,900 | 227,353,077 | 24,654 |

| Table 3: Sponsor Name | Provider Name | Form 5500 Service Code | Direct Compensation | Total Plan Assets | Participants: Total |
|---|---|---|---|---|---|
| EXPERT LLC | PARTNERS LLC | Investment advisory | | | |
| BROTHER INTERNATIONAL CORPORATION | CAPFINANCIAL PARTNERS DBA CAPTRUST | 27 Investment advisory | 17,500 | 228,197,088 | 1,198 |
| FREDRIKSON & BYRON PA | CAPFINANCIAL PARTNERS LLC | 27 Investment advisory | 17,949 | 373,179,228 | 931 |
| HAIER US APPLIANCE SOLUTIONS INC | CAPFINANCIAL PARTNERS LLC | 27 Investment advisory | 16,812 | 210,876,659 | 5,441 |
| MAHER TERMINALS LLC | CAPFINANCIAL PARTNERS LLC | 27 Investment advisory | 20,297 | 114,281,724 | 199 |
| MOHEGAN TRIBAL GAMING AUTHORITY | CAPFINANCIAL PARTNERS LLC | 27 Investment advisory | 18,290 | 368,643,384 | 7,974 |
| NEP BROADCASTING LLC | CAPFINANCIAL PARTNERS LLC | 27 Investment advisory | 20,625 | 154,043,593 | 2,152 |
| QUINNIPIAC UNIVERSITY | CAPFINANCIAL PARTNERS LLC | 27 Investment advisory | 20,533 | 194,873,011 | 1,709 |
| RIKER DANZIG SCHERER HYLAND & PERRETTI LLP | CAPFINANCIAL PARTNERS LLC | 27 Investment advisory | 22,217 | 118,672,845 | 215 |
| SILGAN CONTAINERS | CAPFINANCIAL PARTNERS LLC | 27 Investment advisory | 13,667 | 219,365,458 | 4,423 |
| SRC INC | CAPFINANCIAL PARTNERS LLC | 27 Investment advisory | 26,321 | 311,679,534 | 2,375 |
| SRC INC | CAPFINANCIAL PARTNERS LLC | 27 Investment advisory | 21,418 | 256,717,198 | 2,423 |
| STERNE KESSLER GOLDSTEIN & FOX PL LC | CAPFINANCIAL PARTNERS LLC | 27 Investment advisory | 15,202 | 125,072,798 | 645 |
| THE CHILDRENS HOSPITAL CORPORATION | CAPFINANCIAL PARTNERS LLC | 27 Investment advisory | 13,320 | 224,248,466 | 1,932 |
| TOPS MARKETS LLC | CAPFINANCIAL PARTNERS LLC | 27 Investment advisory | 15,000 | 183,430,278 | 2,230 |
| TREDEGAR CORPORATION | CAPFINANCIAL PARTNERS LLC | 27 Investment advisory | 17,750 | 136,490,169 | 1,994 |
| VEECO INSTRUMENTS INC | CAPFINANCIAL PARTNERS LLC | 27 Investment advisory | 20,876 | 277,079,404 | 1,476 |
| WESTERN ALLIANCE BANK | CAPFINANCIAL PARTNERS LLC | 27 Investment | 35,000 | 271,838,400 | 4,086 |

| Table 3: Sponsor Name | Provider Name | Form 5500 Service Code | Direct Compensation | Total Plan Assets | Participants: Total |
|---|---|---|---|---|---|
| | | advisory | | | |
| ARENTFOX SCHIFF LLP | CAPFINANCIAL PARTNERS LLC | 27 Investment advisory | 12,500 | 214,288,084 | 936 |
| COLUMBIA GRAMMAR AND PREPARATORY SCHOOL | CAPFINANCIAL PARTNERS LLC | 27 Investment advisory | 23,362 | 120,920,563 | 557 |
| KANTAR LLC | CAPFINANCIAL PARTNERS LLC | 27 Investment advisory | 27,912 | 300,396,703 | 2,418 |
| STITES & HARBISON | CAPFINANCIAL PARTNERS LLC | 27 Investment advisory | 27,500 | 154,898,077 | 455 |
| THE PHILADELPHIA INQUIRER PBC | CAPFINANCIAL PARTNERS LLC | 27 Investment advisory | 24,380 | 159,361,463 | 1,287 |
| WOMBLE BOND DICKINSON (US) LLP | CAPFINANCIAL PARTNERS LLC | 27 Investment advisory | 21,769 | 180,180,307 | 1,033 |

147.    CapTrust's consulting services rates average less than $21,000 for identical services relating to similar-sized retirement plans (see table's "Direct Compensation" column 4), and CapTrust provided the same services based on the U.S. Department of Treasury and Labor reporting on these plans. The main code was SERVICE CODE 27 (Investment advisory).

148.    The Committee agreed to unreasonable rates, for unnecessary services that ended up only hurting the Plan participants. The Committee failed to implement systems that would prevent prohibited transactions and Turning Stone failed to monitor the Committee's failure to prevent prohibited transactions. Turning Stone and the Committee are liable to restore to the Plans all losses suffered as a result of the fiduciary breaches that resulted from prohibited transactions.

## CLASS ALLEGATIONS

149.    Plaintiffs bring this action on behalf of themselves and the Class, which is defined as participants in and beneficiaries of the Plan but excluding Defendants; any person who was or is an officer, director, employee, or a shareholder of 5% or more of the equity of Turning Stone or

is or was a partner, officer, director, or controlling person of Turning Stone; the spouse or children of any individual who is an officer, director or owner of 5% or more of the equity of Turning Stone; Plaintiffs' counsel; judges of the Court in which this case is pending and their current spouse and children; and the legal representatives, heirs, successors and assigns of any such excluded person.

150.    The Class Period is from January 1, 2018, through the date of judgment.

151.    The members of the Class are so numerous, consisting of thousands of members, not including their spouse beneficiaries, who, upon information and belief, are sufficiently dispersed geographically such that joinder of all members is impracticable. The issues of liability are common to all members of the Class and are capable of common answers as those issues.

152.    Plaintiffs' claims are typical of the claims of other members of the Class because their claims arise from the same events, practices and/or courses of conduct described above.

153.    Plaintiffs' claims are also typical of the claims of other members of the Class because the relief sought consists of requiring Defendants to make the Plan whole for any losses caused by their fiduciary breaches and to disgorge their profits to the Plan. Any such recovery from Defendants will be paid to the Plan and any relief will flow to all Class Members through their accounts in the Plan.

154.    Plaintiffs will fairly and adequately represent and protect the interests of the Class.

155.    Plaintiffs do not have any interests antagonistic to or in conflict with those of the Class.

156.    Defendants have no unique defenses against Plaintiffs that would interfere with Plaintiffs' representation of the Class.

157.    Plaintiffs are represented by counsel experienced in prosecuting ERISA class actions and with particular experience and expertise in litigation involving ERISA breaches of fiduciary duty and ERISA prohibited transactions.

158.    The requirements of Fed. R. Civ. P. 23(b)(1)(A) are satisfied. Fiduciaries of ERISA-covered plans have a legal obligation to act consistently with respect to all similarly situated participants and to act in the best interests of the Plan and its participants. This action challenges whether Defendants acted consistently with their obligations under ERISA as to the Plan as a whole. As a result, prosecution of separate actions by individual members would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct relating to the Plan.

159.    The requirements of Fed. R. Civ. P. 23(b)(1)(B) are also satisfied. Administration of an ERISA-covered plan requires that all similarly situated participants be treated the same. Resolving whether Defendants engaged in prohibited transactions with respect to the Plan and fulfilled their fiduciary obligations to the Plan would, as a practical matter, be dispositive of the interests of the other participants in the Plan even if they are not parties to this litigation and would substantially impair or impede their ability to protect their interests if they are not made parties to this litigation by being included in the Class.

160.    The requirements of Fed. R. Civ. P. 23(b)(2) are satisfied as to the Class because Defendants have acted and/or failed to act on grounds generally applicable to the Class, making declaratory and injunctive relief appropriate with respect to the Class as a whole. This action challenges whether Defendants engaged in prohibited transaction and breaches of fiduciary duties which would be violations of ERISA as to the Plan as a whole and as to the Class as a whole. The relief sought in this case primarily consists of declarations that Defendants engaged in prohibited

transactions or breached their fiduciary duties. As ERISA is based on trust law, any monetary relief consists of equitable monetary relief that would either flow directly by the declaratory or injunctive relief or flows as a necessary consequence of that relief

161.    The requirements of Fed. R. Civ. P. 23(b)(3) are also satisfied. The common questions of law and fact concern whether Defendants engaged in prohibited transactions or breached their fiduciary duties to the Plan. As the members of the Class were participants in that Plan, their accounts were affected by those breaches and violations. Common questions related to liability will necessarily predominate over any individual questions precisely because Defendants duties and obligations were uniform to all participants and therefore all members of the Class. As relief and any recovery will be on behalf of the Plan, common questions as to remedies will likewise predominate over any individual issues.

162.    A class action is a superior method to other available methods for the fair and efficient adjudication of this action. As the claims generally are brought on behalf of the Plan, resolution of the issues in this litigation will be efficiently resolved in a single proceeding rather than multiple proceedings and each of those individual proceedings could seek recovery for the entire Plan. Class certification is a superior method of proceeding because it will obviate the need for unduly duplicative litigation which might result in inconsistent judgments about Defendants' duties with regard to the Plan.

163.    The following factors set forth in Rule 23(b)(3) also support certification: a. The members of the Class have an interest in a unitary adjudication of the issues presented here for the reasons that this case should be certified under Rule 23(b)(1). b. No other litigation concerning this controversy has been filed by any other members of the Class. c. This District is the most desirable location for concentrating this litigation because (i) Plaintiffs Vondell, Jones, and Wilcox

are located in this District; (ii) Turning Stone does business in this District; and (iii) a significant number of the Class members are located in this District. d. There are no anticipated difficulties in managing this case as a class action.

## TIMELINESS

164.    Within the six-year period prior to Plaintiffs' filing this suit, Defendants violated one or more of their fiduciary obligations as described above.

165.    At all relevant times during the Class Period, Defendants also made affirmative misrepresentations to participants about the security of their investments, the competence of the portfolio fund managers, the performance history of their investments, and the amount of investment fees they were being charged.

166.    At all relevant times during the Class Period, Defendants intentionally concealed their fiduciary breaches and prohibited transactions to prevent Plan participants from discovering them and avoiding the need to cure the deficiencies.

167.    Plaintiffs did not acquire actual knowledge of these violations until shortly before commencing this action.

168.    Consequently, Plaintiffs' claims in this action are timely under 29 U.S.C. § 1113.

### COUNT I: Breach of Fiduciary Duty of Prudence
### (against the Committee and John Does 1-30)

169.    Plaintiffs repeat and reallege the allegations in the preceding paragraphs as if fully set forth herein.

170.    At all relevant times, Defendants were named and/or de facto fiduciaries of the Plan within the meaning of ERISA insofar that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

171.    ERISA mandates that fiduciaries act with prudence in the disposition of Plan assets and selection and monitoring of investments, as well as in the monitoring and minimization of administrative expenses. 29 U.S.C. § 1104(a)(1)(B).

172.    As fiduciaries of the Plan, Defendants were subject to the duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the Plan's fees and assets for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aim

173.    At all relevant times during the Class Period, Defendants breached their fiduciary duty of prudence in multiple respects as discussed above.

174.    Based on reasonable inferences from the facts set forth in this Complaint, at all relevant times during Class Period, Defendants failed to have a proper system of review in place to ensure, among other things, that: (a) participants in the Plan were being charged appropriate and reasonable fees for the Plan's third-party service providers; (b) their selection and retention of investment options were prudent; and (c) Plan expenses were reasonable and necessary.

175.    At all relevant times during the Class Period, Defendants did not have adequate procedures in place to monitor Plan service providers and investments and did not act in the best interests of the Plan participants. As a direct and proximate result of these breaches of fiduciary duties, the Plan and its participants suffered millions of dollars in losses. Had Defendants complied

with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more funds available to them for their retirement.

176.    Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by its breaches of fiduciary duties and must restore any profits resulting from such breaches.

177.    In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in the Prayer for Relief.

### COUNT II: Breach of Fiduciary Duty of Loyalty
### (against the Committee and John Does 1-30)

178.    Plaintiffs repeat and reallege the allegations in the preceding paragraphs as if fully set forth herein.

179.    At all relevant times, Defendants were named and/or de facto fiduciaries of the Plan within the meaning of ERISA insofar that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

180.    ERISA fiduciaries owe a duty of loyalty. 29 U.S.C. § 1104(a)(1)(A). The duty of loyalty requires fiduciaries to act "for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan." *Id*.

181.    The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000). "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display…complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Id*. at 224 (quotation marks and citations omitted).

182.    "Thus, in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider only factors relating to the interests of plan participants and

beneficiaries in their retirement income. A decision to make an investment may not be influenced by non-economic factors unless the investment, when judged solely on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan." U.S. Dep't of Labor ERISA Adv. Op. 88-16A (Dec. 19, 1988).

183. At all relevant times during the Class Period, Defendants breached their fiduciary duty of loyalty in multiple respects as described above by consistently choosing worse investment options for the Plan participants in exchange for revenue share benefits for Defendants.

184. The Committee failed to only act with the exclusive purpose of providing benefits to participants by allowing revenue share, unnecessary costs, and excessive costs diminish Plan participants retirement funds.

185. The Committee failed to only act with the exclusive purpose of providing benefits to participants by choosing less economically favorable options in exchange for revenue share kickbacks that benefited Defendants at the expense of the participants.

186. As a direct and proximate result of their breaches of this fiduciary duty, the Plan and its participants suffered millions of dollars in losses. Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

187. Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by its breaches of fiduciary duties and must restore any profits resulting from such breaches.

188. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in the Prayer for Relief.

**COUNT III: Breach of Co-Fiduciary Duties**
**(against the Committee and John Does 1-30)**

189.    Plaintiffs repeat and reallege the allegations in the preceding paragraphs as if fully set forth herein.

190.    ERISA § 405, 29 U.S.C. § 1105, makes a fiduciary of a Plan liable for another fiduciary of the same plan's breach: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary unless he makes reasonable efforts under the circumstances to remedy the breach.

191.    Each Defendant had the data and information available to them to discover or stop the fiduciary breaches.

192.    Each Defendant knew and had the necessary data and information available to them to know of persistent manager underperformance, excessive risks, excessive manager costs, and opportunities for better performing investments.

193.    Nevertheless, each Defendant chose to ignore, acquiesce, or participate in the ongoing breaches of fiduciary duty.

194.    Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

### COUNT IV: Breach of Fiduciary Duty of Prudence
### (against Turning Stone)

195.    Plaintiffs repeat and reallege the allegations in the preceding paragraphs as if fully set forth herein.

196.    Defendant Turning Stone is the Plan Sponsor as defined by ERISA. 29. U.S.C. § 1002(16)(B). Defendant Turning Stone appointed individuals to serve on the Committee. Committee members served as fiduciaries of the Plan and at the discretion of Defendant Turning Stone. Defendant Turning Stone, at all relevant times, was aware that the Committee had critical responsibilities as a fiduciary of the Plan.

197.    Defendant Turning Stone, as the appointing fiduciary, had a duty to monitor the Committee at regular intervals to ensure that the Committee was adequately performing its fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee was not fulfilling those duties.

198.    Defendant Turning Stone also had a duty to ensure that the Committee possessed the needed qualifications and experience to carry out its duties; had adequate financial resources and information; maintained adequate records of the information on which it based its decisions and analysis with respect to the Plan's investments; and reported regularly to Defendant Turning Stone.

199.    Defendant breached its fiduciary monitoring duties by, among other things: (a) failing to monitor and evaluate the performance of the Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee's imprudent actions and omissions; (b) failing to monitor the processes by which the Plan's expenses and investments were evaluated; and (c) failing to remove the Committee as a fiduciary whose performance was blatantly inadequate in that it continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, ignored its IPS in selection of funds

and managers, and caused the Plan to pay excessive recordkeeping fees, all to the detriment of the Plan and the retirement savings of the Plan's participants.

200.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars in losses. Had Defendant Turning Stone complied with its fiduciary obligations, the Plan would not have suffered these losses, and participants of the Plan would have had more money available to them for their retirement.

201.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendant Turning Stone is liable to restore to the Plan all losses caused by its failure to adequately monitor the Committee. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

### COUNT V: Violation of 29 U.S.C. § 1106(a) Prohibited Transactions
### (against the Committee and John Does 1-30)

202.    Plaintiffs repeat and reallege the allegations in the preceding paragraphs as if fully set forth herein.

203.    ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1), provides, in pertinent part, that "a fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . (C) furnishing of goods, services, or facilities between the plan and a party in interest; [or] (D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan and a party in interest."

204.    ERISA § 3(14), 29 U.S.C. § 1002(14), defines a "party in interest" to include (A) "any fiduciary . . . of such employee benefit plan;" (B) "a person providing services to such plan;" (C) "an employer any of whose employees are covered by such plan," and "(H) any employee, officer, or director of such employer."

205.    ERISA § 3(9), 29 U.S.C. § 1002(9) defines "person" as "an individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, association, or employee organization."

206.    All of the Defendants are or were both a fiduciary and a party-in-interest subject to ERISA § 406(a)(1)(C), (D).

207.    The Committee's inclusion of and failure to remove the imprudent funds in the Plan described above amounted to a direct or indirect "furnishing of goods, services, or facilities between the plan and a party in interest" pursuant to ERISA § 406(a)(1)(C) and the "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan" pursuant to ERISA § 406(a)(1)(D).

208.    The Committee's decision to agree to kickbacks in form of revenue sharing to third parties and Turning Stone as described amounted to a direct or indirect "furnishing of goods, services, or facilities between the plan and a party in interest" pursuant to ERISA § 406(a)(1)(C) and the "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan" pursuant to ERISA § 406(a)(1)(D).

209.    The Committee's agreeing to pay excessive fees to managers of funds amounted to a direct or indirect "furnishing of goods, services, or facilities between the plan and a party in interest" pursuant to ERISA § 406(a)(1)(C) and the "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan" pursuant to ERISA § 406(a)(1)(D).

210.    To the extent any of them are not fiduciaries, Defendants, as parties-in-interest, may be held liable for knowing participation in these violations of ERISA §§ 406(a)(1)(C) and (D) pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) regardless of whether they were ERISA fiduciaries.

211.    Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants, as fiduciaries to the Plan, are liable to restore to the Plan all losses caused by their violations of ERISA §§ 406(a)(1)(C) and (D).

**COUNT VI: Violation of 29 U.S.C. § 1106(b) Prohibited Transactions**

212.    Plaintiffs repeat and reallege the allegations in the preceding paragraphs as if fully set forth herein.

213.    ERISA § 406(b), 29 U.S.C. § 1106(b), provides: "A fiduciary with respect to a plan shall not— (1) deal with the assets of the plan in his own interest or for his own account, (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

214.    Each of Defendants is or was both a fiduciary and a party-in-interest subject to ERISA § 406(b).

215.    Defendants violated each of the above prohibited transaction rules. Their inclusion of and failure to remove the imprudent funds from the Plan described above resulted from the their "deal[ing] with the assets of the plan in [their] own interest or for [their] own account" in violation of ERISA § 406(b)(1), "act[ing] in any transaction involving the plan on behalf of a party … whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries" in violation of ERISA § 406(b)(2), and "receiv[ing] any consideration for [their] own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."

216.    At all relevant times during the Class Period, Defendants each acquired valuable consideration as a result of the investment options recommended, selected, and retained in the Plan and as a result of the revenue sharing agreements among them.

217.    Among this consideration was rebates of Plan expenses which belonged to Plan participants, as well as portions of participant contributions they individually retained for their own benefit.

218.    The Committee engaged in prohibited transactions by selecting the imprudent funds to earn profit for the broker at the expense of Plaintiffs' retirement investments through revenue sharing and kickback arrangements.

219.    Defendants failed to inform participants adequately of the risks of investing in the managed funds, and that the funds charged substantially higher fees than "readily available and comparable fund options."

220.    In doing so, Defendants dealt with the assets of the Plan in their own interest and/or for their own account in violation of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1).

221.    In doing so, Defendants also acted adverse to the interests of the Plan and Plan participants in violation of ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2).

222.    And in doing so, Defendants each received consideration for their personal account from a party dealing with the Plan, in a transaction involving the assets of the Plan, in violation of ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3).

223.    Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants, as fiduciaries to the Plan, are liable to restore to the Plan all losses caused by their violations of ERISA §§ 406(b).

## PRAYER FOR RELIEF

Wherefore Plaintiffs pray that judgment be entered against Defendants on all claims, and request that the Court order or award the following relief:

A. Certify this action as a class action pursuant to Fed. R. Civ. P. 23, appoint the Plaintiffs as class representatives, and appoint the law firm of Milberg Coleman Bryson Phillips Grossman PLLC as class counsel;

B. Order Defendants to disgorge any profits they received as a result of the above breaches of fiduciary duty;

C. Impose a constructive trust over these profits;

D. Impose a monetary surcharge against Defendants;

E. Apportion all amounts recovered for the Plan among the Plaintiffs and the Class

F. Order that any amount to be paid to the Plan and/or accounts of Plaintiffs and Class members can be satisfied by using or transferring any breaching fiduciary's account (or the proceeds of that account) to the extent of that fiduciary's liability.

G. Require Defendants to pay attorneys' fees and the costs of this action pursuant to ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1), or order the payment of reasonable fees and expenses to Plaintiffs' counsel on the basis of the common benefit or common fund doctrine (or other applicable law) out of any money or benefit recovered for the Class in this action.

H. Award pre-judgment and post-judgment interest.

I. Award any other such relief the Court determines Plaintiffs and the Class are entitled to pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a).

Dated: December 30, 2024                    Respectfully submitted,

                                         */s/ Randi Kassan*
                                         Randi Kassan
                                         **MILBERG COLEMAN BRYSON**
                                         **PHILLIPS GROSSMAN, PLLC**

100 Garden City Plaza, Suite 500
Garden City, NY  11530
Phone: 516-741-5600
rkassan@milberg.com

Gary M. Klinger*
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Phone: 866-252-0878
gklinger@milberg.com

Alex Rudenco*
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
Phone: (865) 247-0080
arudenco@milberg.com

*Attorneys for Plaintiff and
the Prospective Class*

*\*Pro Hac Vice* forthcoming